# EXHIBIT "1"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

OSCAR ROBERTO CELASCO, GSSC,
SP, GSSC HOLDINGS LTD.,
CENTRICA INVESTMENT CAPITAL,
INC., MESOAMERICA ACRE FARMS,
INC., GSS CAPITAL LTD., and
WESTWOOD HOLDING INC.,

      Petitioners,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED,

      Respondent.

_____

### DECLARATION OF DANIEL J. BALL

I, Daniel J. Ball, declare as follows:

1.    I am an associate with the law firm Morgan Lewis & Bockius LLP.  I am admitted to practice law in Massachusetts.

2.    I was one of the attorneys representing Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") in the FINRA arbitration captioned *Oscar Roberto Celasco et al. v. Merrill Lynch* and am familiar with the pleadings and evidence in that matter.  I was admitted *pro hac vice* in California in connection with the arbitration.

3.    Attached hereto as Exhibit A is a true and correct copy of a Delaware Corporation Report for Westwood Holding Inc. ("Westwood") that was located by one of the research librarians who works with my law firm.

1

4.      Attached hereto as Exhibit B is a true and correct copy of the June 2013 Merrill Lynch account statement for Westwood.

5.      Attached hereto as Exhibit C is a true and correct copy of Petitioner's Amended Statement of Claim in the underlying FINRA arbitration.

6.      Attached hereto as Exhibit D is a true and correct copy of the Summons served upon Merrill Lynch in the state court action subject to the instant Notice of Removal.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 1st day of March 2019.

Daniel J. Ball

# EXHIBIT A

**Important:**  The Public Records and commercially available data sources used on reports have errors.  Data is sometimes entered poorly, processed incorrectly and is generally not free from defect.  This system should not be relied upon as definitively accurate.  Before relying on any data this system supplies, it should be independently verified.  For Secretary of State documents, the following data is for information purposes only and is not an official record.  Certified copies may be obtained from that individual state's Department of State.  The criminal record data in this product or service may include records that have been expunged, sealed, or otherwise have become inaccessible to the public since the date on which the data was last updated or collected.

Accurint does not constitute a "consumer report" as that term is defined in the federal Fair Credit Reporting Act, 15 USC 1681 et seq. (FCRA).  Accordingly, Accurint may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA.

**Your DPPA Permissible Use:**  No Permissible Purpose
**Your GLBA Permissible Use:**  No Permissible Purpose
**Your DMF Permissible Use:**  Legitimate Business Purpose Pursuant to a Law, Government Rule, Regulation, or Fiduciary Duty

## Delaware Corporation Report



## Delaware Corporation Report

### General Information

| | | | |
|---|---|---|---|
| **Company Name:** | WESTWOOD HOLDING INC. | **Stock Company:** | True |
| **File Number:** | 4594579 | **Corporation Type:** | General Corporation |
| **Date Incorporated:** | 09/02/2008 | **Incorporation State:** | DE |
| **Status:** | Void, AR's or Tax Delinquent | **Status Date:** | 03/01/2014 |
| **Type:** | Domestic A/R Filing Required | **Renewal Date:** | |
| **Expiration Date:** | | **Last Annual Report Date:** | 2011 |

**Registered Agent:** CORPORATION SERVICE COMPANY  251 LITTLE FALLS DRIVE, WILMINGTON,  (CORPORATION SERVICE COMPANY)

### Filing History (Last 5 filings)

| | | | |
|---|---|---|---|
| **Filing Year:** | 2008 | **Document Code:** | Stock Corporation |
| **Filing Date:** | 09/02/2008 | **Effective Date:** | 09/02/2008 |
| **Number Pages:** | 1 | **Former Name:** | |
| **Merger Type:** | | | |

### Stock Information

| | | | |
|---|---|---|---|
| **Amendment:** | | **Effective Date:** | 09/02/2008 |
| **Total Authorized Shares:** | 1000 | | |
| **Description:** | COMMON | **Designated Shares:** | 0 |
| **Par Value:** | 0.01 | | |

### Tax Information

**Tax Balance : $536**

**Tax Year: 2013**

| | |
|---|---|
| **Filing Amount:** | 50.00 |
| **Tax Amount:** | 75.00 |
| **Penalty Amount:** | 125.00 |
| **Interest Amount:** | 0.00 |
| **Other Amount:** | 0.00 |
| **Paid Amount:** | (0.00) |
| | ------------------ |
| **Balance:** | $250 |
| | ------------------ |

**Tax Year: 2012**

| | |
|---|---|
| **Filing Amount:** | 50.00 |
| **Tax Amount:** | 75.00 |
| **Penalty Amount:** | 125.00 |
| **Interest Amount:** | 36.00 |

**Other Amount:** 0.00
**Paid Amount:** (0.00)
------------------
**Balance:** $286
------------------


**Tax Year:** 2011
**Filing Amount:** 50.00
**Tax Amount:** 75.00
**Penalty Amount:** 0.00
**Interest Amount:** 0.00
**Other Amount:** 0.00
**Paid Amount:** (125.00)
------------------
**Balance:** $0
------------------

# EXHIBIT B



**Merrill Lynch**
**Wealth Management**
Bank of America Corporation

Primary Account: ███████

WESTWOOD HOLDING INC.
████████████████
███████████████

# ■ YOUR MERRILL LYNCH REPORT

June 01, 2013 - June 28, 2013

## PORTFOLIO SUMMARY

| | June 28 | May 31 | Month Change | |
|---|---|---|---|---|
| **Net Portfolio Value** | - | $3,595.00 | ($3,595.00) | ▼ |
| Your assets | - | $3,595.00 | ($3,595.00) | ▼ |
| Your liabilities | - | | | |
| Your Net Cash Flow (Inflows/Outflows) | ($3,595.00) | - | | |
| Securities You Transferred In/Out | - | - | | |
| ***Subtotal Net Contributions*** | ***($3,595.00)*** | - | | |
| Your Dividends/Interest Income | - | - | | |
| Your Market Change | - | - | | |
| ***Subtotal Investment Earnings*** | - | - | | |

If you have questions on your statement,
call 24-Hour Assistance:
**(866) 4MLBUSINESS**
**(866) 465-2874**
Access Code: 47-575-07317

**Investment Advice and Guidance:**
**Call Your Financial Advisor**

**Your Financial Advisor:**
JOHN A FLASCO
████████████████████
███████████████
███████████

Up-to-date account information can be viewed
at: www.mymerrill.com, where your statements
are archived for three or more years.

Questions about MyMerrill?  Click the "help" tab
at the top of the screen once you log in.

**Total Value (Net Portfolio Value plus Assets Not Held/Valued By MLPF&S, if any) in thousands, 2010-2013**



## COULD RISING INTEREST RATES IMPACT YOUR FINANCIAL STRATEGY?

Even a small increase in rates could have an impact on your financial situation. Visit www.ml.com/interestrates for our latest insights on interest rates and how you can work with
your advisor to help offset the risks while making the most of opportunities.

*Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S) and other subsidiaries of Bank
of America Corporation.  MLPF&S is a registered broker-dealer, Member Securities Investor Protection Corporation (SIPC) and a wholly owned subsidiary of Bank of America
Corporation.  Investment products:*  | Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |

+

ML-Celasco-0110068

This page intentionally left blank

ML-Celasco-0110069



**Merrill Lynch**
**Wealth Management**
Bank of America Corporation

Online at: **www.mymerrill.com**

Account Number: ███████

**24-Hour Assistance: (866) 4MLBUSINESS**
Access Code: 47-575-07317

WESTWOOD HOLDING INC.
███████████

**Net Portfolio Value:** **$0.00**

**Your Financial Advisor:**
JOHN A FLASCO

 **WCMA® ACCOUNT**

June 01, 2013 - June 28, 2013

| ASSETS | June 28 | May 31 |
|---|---|---|
| Cash/Money Accounts | - | 3,595.00 |
| Fixed Income | - | - |
| Equities | - | - |
| Mutual Funds | - | - |
| Options | - | - |
| Other | - | - |
| Subtotal (Long Portfolio) | - | 3,595.00 |
| **TOTAL ASSETS** | - | $3,595.00 |

| LIABILITIES | | |
|---|---|---|
| Debit Balance | - | - |
| Short Market Value | - | - |
| **TOTAL LIABILITIES** | - | - |
| **NET PORTFOLIO VALUE** | - | $3,595.00 |

| CASH FLOW | This Statement | Year to Date |
|---|---|---|
| **Opening Cash/Money Accounts** | **$3,595.00** | |
| CREDITS | | |
| Funds Received | - | - |
| Electronic Transfers | - | - |
| Other Credits | - | - |
| Subtotal | | |
| DEBITS | | |
| Electronic Transfers | - | (6,075.00) |
| Margin Interest Charged | | |
| Other Debits | (3,595.00) | (3,925.00) |
| Visa Purchases (debits) | - | - |
| ATM/Cash Advances | - | - |
| Checks Written/Bill Payment | - | - |
| Subtotal | (3,595.00) | (10,000.00) |
| **Net Cash Flow** | **($3,595.00)** | **($10,000.00)** |
| Dividends/Interest Income | - | - |
| Security Purchases/Debits | - | - |
| Security Sales/Credits | - | - |
| **Closing Cash/Money Accounts** | - | |
| Securities You Transferred In/Out | - | - |

*Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S) and other subsidiaries of Bank of America Corporation. MLPF&S is a registered broker-dealer, Member Securities Investor Protection Corporation (SIPC) and a wholly owned subsidiary of Bank of America Corporation. Investment products:*

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
|---|---|---|

ML-Celasco-0110070

WESTWOOD HOLDING INC.                              Account Number: ▮▮▮▮▮▮▮          **24-Hour Assistance: (866) 4MLBUSINESS**
                                                                                        Access Code: 47-575-07317

## *YOUR WCMA TRANSACTIONS*                                                                June 01, 2013 - June 28, 2013

**CASH/OTHER TRANSACTIONS**

| Date | Transaction Type | Quantity | Description | Debit | Credit |
|------|------------------|----------|-------------|-------|--------|
| 06/13 | Journal Entry | | TR TO ▮▮▮▮▮▮ | 3,595.00 | |
| | | | N/O G.S.S. CAPITAL GROUP | | |
| 06/14 | Transferred | | TFR TO ▮▮▮▮▮ | | |
| | *Subtotal (Other Debits/Credits)* | | | *3,595.00* | |
| | **NET TOTAL** | | | **3,595.00** | |

## *YOUR WCMA MONEY FUND TRANSACTIONS*

| Date | Description | Sales | Purchases | Date | Description | Sales | Purchases |
|------|-------------|-------|-----------|------|-------------|-------|-----------|
| 06/13 | BBIF MONEY FUND | 3,595.00 | | | CLASS 1 | | |
| | **NET TOTAL** | | | | | **3,595.00** | |

+

ML-Celasco-0110071

## Customer Service

Please promptly report any inaccuracy, discrepancy, and/or concern by calling Wealth Management Client Support at (800-MERRILL) within ten (10) business days after delivery of or communication of the account statement. You should re-confirm any oral communications in writing to protect your rights.

## About Us

You may review our financial statement at our offices: Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), One Bryant Park, New York, New York 10036. If you request a copy of our financial statement, we will mail it to you.

We are associated with a NYSE Designated Market Maker (DMM) that may make a market in the security(ies) held in your account. At any time, the DMM may have a "long" or "short" inventory position in such security(ies) and may be on the opposite side of transactions in the security(ies) executed on the floor of the NYSE. We also act as a market maker, dealer, block positioner or arbitrageur in certain securities. These activities may put us or one of our affiliates on the opposite side of transactions we execute for you and potentially result in trading profits for us or our affiliates.

BofA Merrill Lynch Research is research produced by MLPF&S and/or one or more of its affiliates. Third party research ratings from selected vendors are provided, if available, for your information. Our providing these research ratings is not a solicitation or recommendation of any particular security. MLPF&S and its affiliates are not responsible for any third party research and have no liability for such research. You are responsible for any trading decision you make based upon third party research ratings and reports.

MLPF&S may make available to you certain securities and other investment products that are sponsored, managed, distributed or provided by companies that are affiliates of Bank of America Corporation (BAC) or in which BAC has a substantial economic interest, including BofA™ Global Capital Management.

Merrill Edge is the marketing name for two businesses: Merrill Edge Advisory Center™, which offers team-based advice and guidance brokerage services; and a self-directed online investing platform. Both are made available through MLPF&S.

Bank of America Merrill Lynch is the marketing name for the global banking and global markets businesses of BAC. Lending, derivatives, and other commercial banking activities are performed globally by banking affiliates of BAC, including Bank of America, N.A.,

member Federal Deposit Insurance Corporation (FDIC). Securities, strategic advisory, and other investment banking activities are performed globally by investment banking affiliates of BAC ("Investment Banking Affiliates"), including, in the United States, MLPF&S and Merrill Lynch Professional Clearing Corp., all of which are registered broker dealers and members of Financial Industry Regulatory Authority (FINRA) and Securities Investor Protection Corporation (SIPC), and, in other jurisdictions, locally registered entities.

Investment products offered by Investment Banking Affiliates, including MLPF&S, ARE NOT FDIC INSURED, ARE NOT BANK GUARANTEED AND MAY LOSE VALUE.

## Additional Information

We will route your equity and option orders to market centers consistent with our duty of best execution.

Except for certain custodial accounts, we hold bonds and preferred stocks in bulk segregation. If there is a partial call for those securities, securities will be randomly selected from those held in bulk. The probability of your holdings being selected is proportional to the total number of customer holdings of that particular security that we hold.

This statement serves as a confirmation of certain transactions during the period permitted to be reported periodically. Additional information is available upon written request.

In accordance with applicable law, rules and regulations, your free credit balance is not segregated and we can use these funds in our business. You have the right to receive, in the normal course of business, any free credit balance and any fully paid securities to which you are entitled, subject to any obligations you owe in any of your accounts.

You will have the right to vote full shares and we may solicit voting instructions concerning these full shares in your account. Voting shares in your account will be governed by the then current rules and policies of FINRA and the Securities Exchange Commission or other applicable exchanges or regulatory bodies.

All transactions are subject to the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market, and its clearinghouse, if any, where the transactions are executed, and if not executed on any exchange, FINRA.

You may obtain an investor brochure that includes information describing the FINRA Regulation Public Disclosure Program ("Program"). To obtain a brochure or more information about the Program or your broker contact the FINRA Regulation Public Disclosure Program Hotline at (800)289-9999 or access the FINRA website

at www.finra.org.

We receive a fee from ISA® banks of up to 2% per annum of the average daily balances. We receive a fee from our affiliated banks of up to $30 per annum for each retirement account and $65 per annum for each non-retirement account that sweeps balances to the banks under the RASP℠ and ML bank deposit programs. We receive a fee from Bank of America, N.A. of up to 0.25% per annum of the average daily Preferred Deposit ® and Preferred Deposit for Business® balances.

## Options Customers

For all customers, including those who own options, please promptly advise us of any material change in your investment objectives or financial condition. Individual options commission charges have been included in your confirmation. You may request a summary of this information.

## Margin Customers

If this statement is for a margin account, it is a combined statement of your margin account and special memorandum account maintained for you pursuant to applicable regulations. The permanent record of the separate account, as required by Regulation T, is available for your inspection upon request. You should retain this statement for use with your next statement to calculate interest charges, if any, for the period covered by this statement. The interest charge period will parallel the statement period, except that interest due for the final day of the statement period will be carried over and appear on your next statement.

## Protection for your Account

The Securities Investor Protection Corporation (SIPC) and our excess-SIPC insurance do not cover commodities futures contracts, fixed annuity contracts, hedge funds, private equity funds, commodity pools and other investment contracts (such as limited partnerships) that are not registered with the US Securities Exchange Commission, precious metals, other assets that are not securities, as defined by SIPC, and assets that are not held at MLPF&S, such as cash on deposit at FIA Card Services, N.A. and Bank of America California, N.A. (Merrill Lynch Affiliated Banks), Bank of America, N.A. (BANA) or other depository institutions. Those bank deposits are protected by the FDIC. MLPF&S is not a bank. Unless otherwise disclosed, INVESTMENTS THROUGH MLPF&S ARE NOT FDIC INSURED, ARE NOT BANK GUARANTEED AND MAY LOSE VALUE. To obtain information about SIPC, including the SIPC Brochure, contact SIPC at http://www.sipc.org or (202)371-8300.

+

ML-Celasco-0110072

## Fixed Income Securities

Values on your statement generally are based on estimates obtained from various sources. These values assume standard market conditions, are not firm bids or offers and may vary from prices achieved in actual transactions, especially for thinly traded securities. These values are generally for transactions of $1 million or more, which often reflect more favorable pricing than transactions in smaller amounts. You may pay more than these values if you purchase smaller amounts of securities, or receive less if you sell smaller amounts of securities.

## Prices and Valuations

While we believe our pricing information to be reliable, we cannot guarantee its accuracy. Pricing information provided for certain thinly traded securities may be stale.

Investments such as direct participation program securities (e.g., partnerships, limited liability companies, and real estate trusts which are not listed on any exchange), and alternative investments (e.g. commodity pools, private equity funds, private debit funds, and hedge funds) are generally illiquid investments. No formal trading market exists for these securities and their current values will likely be different from the purchase price. Unless otherwise indicated, and except for certain alternative investment funds sponsored by affiliates of MLPF&S, the value shown on this statement for an investment in these securities has been provided by the management, administrator or sponsor of each program or a third-party vendor, in each case without independent verification by MLPF&S. This value represents their estimate of the value of the investor's interest in the net assets of the program, as of a date no more than 18 months from the date of this statement. Therefore, the values shown may not reflect actual market value or be realized upon a sale. If an estimated value is not provided, accurate valuation information is not available.

## Cost Data/Realized Capital Gains & Losses

Cost Data and Realized Capital Gains/Losses are provided in this statement for informational purposes only. Please review for accuracy. Merrill Lynch is not responsible for omitted or restated data. Please consult your tax advisor to determine the tax consequences of your securities transactions. Your statement is not an official accounting of gains/losses. Please refer to your records, trade confirmations, and

+

your Consolidated Tax Reporting Statement (Form 1099).

## Insurance Policies and Annuity Contracts

Information is based on data from the issuing insurer. We are not responsible for the calculation of policy/contract values. Insurance policies and annuity contracts are generally not held in your MLPF&S account. If we, as custodian or trustee, hold an annuity contract that is a security, SIPC protection and excess-SIPC protection apply.

## Estimated Annual Income and Current Yield

Estimated Annual Income and Current Yield for certain types of securities could include a return of principal or capital gains in which case the Estimated Annual Income and Current Yield would be overstated. Estimated Annual Income and Current Yield are estimates and the actual income and yield might be lower or higher than the estimated amounts. Current Yield is based upon Estimated Annual Income and the current price of the security and will fluctuate.

## Symbols and Abbreviations

| | |
|---|---|
| ¤ | Interest reported to the IRS |
| ■ | Gross Proceeds reported to the IRS |
| * | Dividends reported to the IRS |
| : | Transactions reported to the IRS |
| OCC | Options Clearing Corporation |
| # | Transaction you requested same day payment. Prior day's dividend retained to offset cost of advancing payment on your behalf |
| N/A | Price, value and/or cost data not available |
| N/C | Not-Calculated |
| N/N | Non-negotiable securities |
| N/O | Securities registered in your name |
| N/O CUST | Non-negotiable securities registered in the name of the custodian |
| ↑ ↓ | Indicates that BofA Merrill Lynch Research has upgraded (↑) or downgraded (↓) its fundamental equity opinion on a security. |

ML-Celasco-0110073

# EXHIBIT C

FINRA DISPUTE RESOLUTION
CASE NO.: <u>16-02805</u>

**IN THE MATTER OF ARBITRATION BETWEEN**

OSCAR ROBERTO CELASCO, individually and
as settlor of the GSSC SP, and GSSC HOLDINGS
LTD; MESOAMERICA ACRE FARMS, INC.;
CENTRICA INVT CAPITAL INC.; G.S.S.
CAPITAL GROUP LIMITED; and WESTWOOD
HOLDING INC.,

     Claimants,

v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH, INCORPORATED,

     Respondent.

_____/

## AMENDED STATEMENT OF CLAIM

Claimants, OSCAR ROBERTO CELASCO, individually and as settlor of GSSC SP, and

GSSC HOLDINGS LTD.; MESOAMERICA ACRE FARMS, INC.; CENTRICA INVT

CAPITAL INC.; G.S.S. CAPITAL GROUP LIMITED; and WESTWOOD HOLDING INC.,

bring this action against MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

("Merrill Lynch").

## PRELIMINARY STATEMENT

The Claimants' in this case consist of a single individual, Oscar Roberto Celasco and

companies owned by Mr. Celasco, which were established to hold the majority of his net worth.

As detailed herein, Mr. Celasco maintained significant assets with Respondent, at times exceeding

fifteen million dollars ($15,000,000) in value.

1

Over the course of the parties' relationship and unbeknownst to Mr. Celasco, Respondent and its employee, John Anthony Flasco, indiscriminately, unsuitably and fraudulently recommended that Claimants' open numerous accounts, many of which were then enrolled in Merrill Lynch's Personal Advisory program ("MLPA") or Merrill Lynch's Unified Managed Account program ("UMA"). Respondent and its employee, Mr. Flasco, recommended to Mr. Celasco that he enroll in these advisory services and wrap-fee programs and marketed them as suitable and in the best interest of Mr. Celasco and his companies. However, this was far from the truth. In reality, there are only two reasons for this and both are solely for the benefit of Respondent and its employee, Mr. Flasco.

First, both Merrill Lynch and its employee, Mr. Flasco, benefitted handsomely by enrolling Claimants' accounts in a variety of advisery services and wrap-fee programs in addition to standard brokerage accounts. The annual fees, compensation, and commissions the accounts were generating over the relevant time period is estimated to be over $1.2 million alone to Merrill Lynch and its employee, Mr. Flasco. Such extreme levels of compensation could not be achieved had Respondent made suitable recommendations regarding the Claimants' investment accounts.[1]

The second reason for this was to intentionally and fraudulently confuse Mr. Celasco so that he could not appropriately track and monitor his investments. Respondent and its employee, Mr. Flasco, repeatedly misrepresented the true nature of the accounts and the performance of the investments in order to work the fraudulent scheme and receive the handsome compensation, fees, and commissions that the six dozen accounts were generating.

---

[1] It is important to note that Mr. Celasco was never in agreement with being part of Merrill Lynch's MLPA program because of its high fee structure. Beginning in 2011 Mr. Celasco had, on several occasions, relayed to Respondent and its employee, Mr. Flasco, that he did not want to be enrolled in the MLPA program and that he was not willing to pay the high fees he was being charged therein. This fact is well documented. *See Exhibit "N".* Mr. Flasco refused to entertain his customers concerns and instead would give him a false reassurance that "virtually 100% of [his] 15+ personal family accounts" were enrolled in MLPA" and that it was one of the key reasons why Mr. Flasco stayed at Merrill Lynch. *Id.*

**It is important to note that Respondent and Mr. Celasco entered into a fiduciary relationship and as such, both Mr. Flasco and Merrill Lynch were required to always have Mr. Celasco's best interests in mind.** The Merrill Lynch Unified Managed Account Wrap Fee Program Brochure and the Merrill Lynch Personal Advisor Wrap Fee Program Brochure, both of which govern the parties' arrangement, acknowledge that Respondent is "subject to fiduciary responsibilities under the [Investment] Advisors Act [of 1940] when they provide investment advisory services pursuant to the Agreement." *See* Merrill Lynch Unified Managed Account Wrap Fee Program Brochure, March 21, 2014, attached hereto as ***Exhibit "A",*** and Merrill Lynch Personal Advisor Program Wrap Fee Program Brochure, March 21, 2014, attached hereto as ***Exhibit "B".***

Investment advisers owe a fiduciary duty to their clients under the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(1), (2)] (the "Advisers Act"), including an affirmative duty to act with utmost good faith, to make full and fair disclosure of all material facts, and to employ all reasonable care to avoid misleading the clients. *Abrahamson v. Fleschner*, 568 F.2d 862 (1977).[2]

The SEC has described this fiduciary relationship as follows:

> As an investment adviser, you are a "fiduciary" to your advisory clients. This means that you have a fundamental obligation to act in the best interests of your clients and to provide investment advice in your clients' best interests. You owe your clients a duty of undivided loyalty and utmost good faith. You should not engage in any activity in conflict with the interest of any client, and you should take steps reasonably necessary to fulfill your obligations. You must employ reasonable care to avoid misleading clients and you must provide full and fair disclosure of all material facts to your clients and prospective clients....You must eliminate, or at least disclose, all conflicts of interest that might incline you — consciously or unconsciously — to render advice that is not disinterested...Departure from this

---

[2] The Adviser's Act reflects a congessional recognition "of the delicate fiduciary nature of an investment advisory relationship." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963). *See also Abrahamson*, 568 F.2d 862 (finding the purpose of Investment Advisers Act of 1940 was to protect the public and investors against malpractice by persons paid for advising others about securities; Act was designed for the special benefit of persons relying upon their investment advisers for advice).

fiduciary standard may constitute "fraud" upon your clients (under Section 206 of the Advisers Act).

*See* SEC Information sheet for Newly-Registered Investment Advisers (November 23, 2010), attached hereto as ***Exhibit "C"***.

Anticipating the tried and true industry response to these claims, Merrill Lynch will likely contend that the Claimants' were fully aware of the dozens of accounts. Merrill Lynch will then conveniently forget to mention its fiduciary relationship with the Claimants'. There is simply no credible argument by Merrill Lynch to explain why Mr. Celasco would need over sixty (60) accounts at Merrill Lynch and how the sheer number of accounts could be considered a suitable recommendation on the part of Merrill Lynch and its employee, Mr. Flasco.

Also, Merrill Lynch will cynically assert how Mr. Celasco spends his money in an effort to prejudice the Panel. However, how Mr. Celasco spends his money is irrelevant to the determination as to Merrill Lynch's misconduct and breach of their fiduciary responsibility, none of which has anything to do with how somebody chooses to spend their money.

### JURISDICTION

1. FINRA has jurisdiction over this matter pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure because this dispute is between a FINRA member and its customers.

2. Venue is proper in FINRA's Los Angeles, California hearing location because Mr. Celasco maintained a residence in Los Angeles, California for a significant portion of the time period at issue.

### PARTIES & RELEVANT NON-PARTIES

3. Oscar Roberto Celasco, is a sixty one (61) year old Swiss citizen. He brings the claims asserted herein in his individual capacity and as settlor of GSSC SP. Mr. Celasco established GSSC SP; GSSC Holdings Ltd; Mesoamerica Acre Farms, Inc.; Centrica Invt Capital Inc.; G.S.S. Capital

4

Group Limited; and Westwood Holding Inc., to collectively hold the majority of his liquid net worth. All funds referenced below and deposited into the relevant accounts opened at Merrill Lynch belong to him and were invested by Merrill Lynch and its employee, Mr. Flasco, on his behalf. Mr. Celasco has authority to bring this action on behalf of GSSC SP; GSSC Holdings Ltd; Mesoamerica Acre Farms, Inc.; Centrica Invt Capital Inc.; G.S.S. Capital Group Limited; and Westwood Holding Inc. Moreover, Mr. Celasco is the beneficial owner of GSSC SP; GSSC Holdings Ltd; Mesoamerica Acre Farms, Inc.; Centrica Invt Capital Inc.; G.S.S. Capital Group Limited; and Westwood Holding Inc.

4. **Merrill Lynch, Pierce, Fenner & Smith Incorporated** [CRD# 7691/SEC #8-7221, 801-14235], is a Delaware Corporation and has its headquarters in New York, NY. Merrill Lynch is dually registered as both a registered broker-dealer and **registered investment adviser**, is a Member SIPC. Merrill Lynch is a wholly-owned subsidiary of Bank of America, is a leading global investment banking firm and a registered broker-dealer, investment adviser and futures commission merchant. In the United States, Merrill Lynch acts as a broker (i.e., agent) for corporate, institutional and governmental and private clients and as a dealer (i.e., principal) in the purchase and sale of corporate securities, primarily equity and debt securities traded on exchanges or in the over-the-counter markets. Merrill Lynch also acts as a broker and/or a dealer in the purchase and sale of mutual funds, money market instruments, government securities, high-yield bonds, municipal securities, financial futures contracts, and options. The futures business and foreign exchange activities are conducted through Merrill Lynch and other affiliates. Merrill Lynch operates the firm's U.S. retail branch system, and also provides financing to clients, including margin lending and other extensions of credit as well as a wide variety of financial services, such as securities clearing, retirement services, and custodial

5

services. Merrill Lynch's Coral Gables branch is located at 355 Alhambra Circle, Coral Gables, Florida 33134. This is the only office that Mr. Celasco ever had contact with.

5. **John Anthony Flasco** [CRD # 1936863], is dually registered as both a broker/registered representative and an **investment advisor representative** with Merrill Lynch in its Coral Gables, Florida branch location. Mr. Flasco had Series 2, 3, 7, 63 and 65 securities licenses. *See Investment Adviser Representative Public Disclosure Report for John Anthony Flasco, attached hereto as Exhibit "D".* At all material times, Mr. Flasco was Claimants' investment broker and investment advisor as described in this Amended Statement of Claim. At all material times, Mr. Flasco was employed by and under the control and direction of Merrill Lynch.

6. Managed Account Advisors LLC ("MAA") [CRD# 142558 / SEC# 801-67569], is an indirect wholly-owned subsidiary of Bank of America and a registered investment adviser and currently provides investment advisory services to clients primarily through managed account programs sponsored by its Affiliates, including Merrill Lynch such as accounts enrolled in Merrill Lynch UMA wrap-fee program. MAA also provides discretionary advisory services to Merrill Lynch in connection with investment management and trust services offered by Merrill Lynch to its fiduciary accounts. As of December 31, 2016, MAA manages $255.7 billion in client assets on a discretionary basis.

## STATEMENT OF FACTS

### *The Parties' Fiduciary Relationship*

7. In or around late 2009, Mr. Celasco was introduced to Mr. Flasco. He was looking for a new financial advisor and Mr. Flasco assured him that Merrill Lynch was a long-standing and reputable financial institution that would provide investment expertise and excellent service.

Moreover, Mr. Flasco informed Mr. Celasco that he and his team were international private wealth advisors and who would provide the best service to an international client like Mr. Celasco. In addition, Mr. Flasco informed Mr. Celasco that he was consistently ranked within the top one hundred (100) wealth advisors at Merrill Lynch. In reliance on those representations, Mr. Celasco agreed to open accounts with Merrill Lynch.

8. At that time, Mr. Celasco informed Respondent, including its employee, Mr. Flasco, that he had worked hard his entire life, had saved millions of dollars, and was looking to safeguard his principal and also safely grow the money that he had saved. Mr. Celasco also informed Respondent, including its employee, Mr. Flasco, that he had sufficient income outside of the capital that he was entrusting to Merrill Lynch such that he did not require any income from his investment portfolio maintained with Merrill Lynch and its employee, Mr. Flasco. To that end, his accounts were established with a moderately conservative investment objective.

9. When Mr. Celasco first met with Merrill Lynch, including its employee, Mr. Flasco, the majority of Claimants' liquid assets were invested with HSBC. Respondent including its employee, Mr. Flasco, analyzed Mr. Celasco's HSBC accounts and told him that the assets were poorly invested. Respondent, including its employee, Mr. Flasco, represented that if Mr. Celasco transferred his assets to Merrill Lynch, then Merrill Lynch, including its employee, Mr. Flasco, would invest Mr. Celasco's assets in a safer manner where he also would appreciate greater growth. Based on those representations, among others, Mr. Celasco initially agreed to transfer approximately four million dollars ($4,000,000.00) to Merrill Lynch, including its employee, Mr. Flasco. Over the course of his relationship with Merrill Lynch and its employee, Mr. Flasco, he transferred millions more in cash and securities. In addition, at HSBC, Mr. Celasco had a credit line in the amount of approximately $2,500,000 secured by securities in

his account, the proceeds of which he used to purchase a home in Los Angeles, California. He told Merrill Lynch that he did not require a credit line with Respondent.

### Mr. Celasco Grants Respondent And Its Employee, Mr. Flasco Discretionary Authority Over His Accounts

10. In order to timely manage his accounts without any delays, Respondent, including its employee Mr. Flasco, recommended to Mr. Celasco and advised him that he would benefit by granting Respondent, including its employee, Mr. Flasco, discretionary trading authority over his accounts so that Respondent, including its employee, Mr. Flasco, did not need to check with him before purchasing and selling securities in his accounts. This discretionary authority is evidenced by the Merrill Lynch UMA Wrap Fee Program Brochure wherein it states: "[b]y signing the Client Agreement, you appoint MAA and/or an Implementing Manager you select to act as your agent and attorney-in-fact with such discretionary power and authority, as described above, to buy, sell or otherwise effect transactions in stocks, options, bonds and any other securities or other property, in whole or in part, on margin if contemplated by your Portfolio, for your Account and in your name." *See Exhibit "A",* at pg. 14 and pg. A-4 ("Merrill Lynch or any Implementing Manager selected by you will implement trades in the portfolio on a discretionary basis…"). Moreover, this discretionary authority necessarily involves a fiduciary relationship under common law principles of agent/principal, among other relationships of trust.

11. Based on the trust and confidence that he had in Respondent, including its employee, Mr. Flasco, Mr. Celasco agreed to grant Respondent, including its employee, Mr. Flasco, discretionary authority over at least some of his accounts such that they could purchase and sell securities in at least some of his accounts without his authorization.

12. After receiving discretionary authority over the investment accounts and while having a fiduciary relationship with the Claimants', Respondent, including its employee, Mr. Flasco, repeatedly effectuated transactions, opened accounts on behalf of Claimants', established credit lines for certain Claimants' (and increased the size of Claimants' loans) – all without consulting Mr. Celasco.

### *Merrill Lynch And Its Employee, Mr. Flasco, Open Over 60 Accounts Without Mr. Celasco's Authorization, Knowledge Or Consent And Transfer Money Indiscriminately Between Them*

13. Between 2009 and 2016, Respondent indiscriminately and without Mr. Celasco's knowledge or consent opened dozens of additional accounts in the name of Claimants':

| Account | Name on Account |
| --- | --- |
| xxx-10B31 | Oscar Roberto Celasco |
| xxx -19045 | Oscar Roberto Celasco |
| xxx -10335 | Oscar Roberto Celasco |
| xxx -07317 | Westwood Holding Inc. |
| xxx -07318 | GSS Capital Group Ltd. |
| xxx -03D43 | GSSC SP |
| xxx -03D44 | GSSC SP |
| xxx -03D45 | GSSC SP |
| xxx -03D46 | GSSC SP |
| xxx -07323 | GSSC Holdings Ltd. |
| xxx -02038 | GSSC SP |
| xxx -02B06 | GSSC Holdings Ltd. |
| xxx -02B07 | GSSC Holdings Ltd. |
| xxx -02B08 | GSSC Holdings Ltd. |
| xxx -02B09 | GSSC Holdings Ltd. |
| xxx -02A58 | GSSC Holdings Ltd. |
| xxx -02B04 | GSS Capital Group Ltd. |
| xxx -02B05 | GSS Capital Group Ltd. |
| xxx -02B10 | GSS Capital Group Ltd. |
| xxx -02B11 | GSS Capital Group Ltd. |
| xxx -02B12 | GSS Capital Group Ltd. |
| xxx -02C61 | GSSC Holdings Ltd. |
| xxx -02C84 | GSSC Holdings Ltd. |

| | |
|---|---|
| xxx -02C85 | GSSC Holdings Ltd. |
| xxx -07842 | GSSC Holdings Ltd. |
| xxx -07943 | GSSC Holdings Ltd. |
| xxx -07945 | GSSC Holdings Ltd. |
| xxx -07997 | GSSC Holdings Ltd. |
| xxx -07W20 | Centrica Invt Capital Inc. |
| xxx -03E98 | GSSC SP |
| xxx -03E99 | GSSC SP |
| xxx -02036 | Centrica Invt Capital Inc. |
| xxx -07B51 | GSSC Holdings Ltd. |
| xxx -07B52 | GSSC Holdings Ltd. |
| xxx -07928 | Mesoamerica Acre Farms, Inc. |
| xxx -02030 | Mesoamerica Acre Farms, Inc. |
| xxx -98374 | GSSC SP |
| xxxx -65028 | GSSC Holdings Ltd. |
| xxxxx -14168 | GSSC Holdings Ltd. |
| xxx -03E30 | GSSC SP |
| xxx -03E31 | GSSC SP |
| xxx -03E32 | GSSC SP |
| xxx -02028 | GSSC Holdings Ltd. |
| xxx -02020 | GSSC Holdings Ltd. |
| xxx -02021 | GSSC Holdings Ltd. |
| xxx -02022 | GSSC Holdings Ltd. |
| xxx -02023 | GSSC Holdings Ltd. |
| xxx -02024 | GSSC Holdings Ltd. |
| xxx -02025 | GSSC Holdings Ltd. |
| xxx -02026 | GSSC Holdings Ltd. |
| xxx -02029 | GSSC Holdings Ltd. |
| xxx -02031 | GSSC Holdings Ltd. |
| xxx -02032 | GSSC Holdings Ltd. |
| xxx -02033 | GSSC Holdings Ltd. |
| xxx -02034 | GSSC Holdings Ltd. |
| xxx -02035 | GSSC Holdings Ltd. |
| xxx -02037 | GSSC SP |
| xxx -02040 | GSSC SP |
| xxx -02041 | GSSC SP |
| xxx -02042 | GSSC SP |
| xxx -02043 | GSSC SP |
| xxx -02044 | GSSC SP |

| xxx -02045 | GSSC SP |
|---|---|

14. Mr. Celasco signed less than a handful of account opening documentation on behalf of himself and his companies with respect to these accounts identified. In fact, the majority of the accounts identified above lack any account opening documentation duly signed by Mr. Celasco. With respect to the account opening documentation that does exist, they were opened in Claimants' name without proper authorization. Mr. Celasco was completely unaware that the documentation he signed at Mr. Flasco's request would be used by Respondent, and its employee, Mr. Flasco, to open dozens of accounts. This happened several times during the course of the parties' relationship. By way of example:

   a. On February 9, 2010, one account opening document was used by Respondent and its employee, Mr. Flasco, to open **four** Business Investment Accounts ("BIA") on behalf of GSSC SP, a copy of which is attached hereto as *Exhibit "E"*:

| GSSC SP Accounts opened on 2/9/2010 ||
|---|---|
| Account | Account Type |
| xxx -03D43 | BIA |
| xxx -03D44 | BIA |
| xxx -03D45 | BIA |
| xxx -03D46 | BIA |

   b. On March 18, 2013, Respondent, and its employee, Mr. Flasco, intentionally had Mr. Celasco sign a blank account opening document. After obtaining Mr. Celasco's signature on the blank account opening document, Respondent and its employee, Mr. Flasco, opened **ten** Working Capital Management Accounts ("WCMA") on behalf of GSSC Holdings Ltd. (*see Exhibit "F"*) and GSS Capital Group Ltd. (*see Exhibit "G"*):

| GSSC Holdings Ltd. & GSS Capital Group Ltd. Accounts opened 3/18/2013 |
|---|

11

| Account | Account Type |
|---|---|
| xxx -02C84 | WCMA |
| xxx -02C85 | WCMA |
| xxx -07842 | WCMA |
| xxx -07943 | WCMA |
| xxx -07945 | WCMA |
| xxx -02B04 | WCMA |
| xxx -02B05 | WCMA |
| xxx -02B10 | WCMA |
| xxx -02B11 | WCMA |
| xxx -02B12 | WCMA |

c.  On May 12, 2014, one WCMA Account Opening Booklet was used by Respondent and its employee, Mr. Flasco, to open **six** accounts on behalf of GSSC Holdings, Ltd., a copy of which is attached hereto as *Exhibit "H"*:

| GSSC Holdings Ltd. Accounts opened on 5/12/2014 | |
|---|---|
| Account | Account Type |
| xxx -02C84 | WCMA |
| xxx -02C85 | WCMA |
| xxx -07842 | WCMA |
| xxx -07943 | WCMA |
| xxx -07945 | WCMA |
| xxx -07997 | WCMA |

15. Mr. Celasco had no idea as to the dozens of accounts that were indiscriminately being opened on his behalf and on behalf of his companies in this fashion. Nor could he. Ever since Mr. Celasco opened his first account at Merrill Lynch and with its employee, Mr. Flaso, he was never able to gain online access to view any of his account statements for any of the dozens of accounts that were opened, despite being enrolled in online statements and notwithstanding his repeated requests to Merrill Lynch, including its employee, Mr. Flasco, requesting same. *See* email correspondence, attached hereto as *Exhibit "I"*.

12

16. It is no wonder that, only *after* his accounts were transferred away from Mr. Flasco's management in 2015 that Mr. Celasco, for the very first time, learned of the dozens of accounts that had been open without his authorization between 2009 and 2016 under Mr. Flasco's management at Merrill Lynch. This was the first time Mr. Celasco was able to realize the reality of the situation that he was placed in by those whom he trusted most, Respondent and its employee, Mr. Flasco.

17. Respondent, including its employee, Mr. Flasco, also increased the size of Claimants' credit lines and loans without even consulting Mr. Celasco. For example, there were many instances where Mr. Celasco did not have liquidity needs but Respondent, including its employee, Mr. Flasco, simply increased the size of his loan, to create more assets under management for which it would earn fees and also forcing Claimants' to pay additional amounts of money in loan interest.

18. Further, Respondent, including its employee, Mr. Flasco, often transferred significant sums of money between the myriad accounts without any legitimate reason for doing so.

19. The number of accounts, lack of access to his own account statements and sheer volume of transfers between the accounts eventually made it difficult for both Respondent, including its employee, Mr. Flasco, and Mr. Celasco to monitor the activity, investments, and amount of money in the accounts.

### *Mr. Celasco Begins To Question His Investment Account Balances/Activity And Loses Faith In The Representations Made To Him By Merrill Lynch And Its Employee, Mr. Flasco*

20. In or around 2014, Mr. Celasco came to appreciate that the representations by Respondent and its employee, Mr. Flasco, as to the nature of his investments and profits was a lie. At that point

in time, Mr. Celasco told Mr. Flasco that he wanted a full review of his entire portfolio so that he could determine how his investments were performing.

21. When Mr. Celasco expressed his concerns over the status of his investments, Mr. Flasco often e-mailed Mr. Celasco from his own personal e-mail address, jflasco@aol.com. *See* email exchanges between Mr. Flasco and Mr. Celasco, attached hereto as ***Exhibit "J".*** Private emails are certainly a gross violation of a variety of standards and clearly evidence of fraudulent behavior. Merill Lynch was aware that Mr. Flasco used his personal e-mail address but, upon information and belief, failed to properly monitor that e-mail address and its content.

22. In response to Mr. Celasco's request for a review of his entire portfolio, Respondent, including its employee, Mr. Flasco, consistently gave Mr. Celasco an incomplete analysis. In lieu of providing a complete analysis of Mr. Celasco's portfolio, Respondent, including its employee, Mr. Flasco, merely informed Mr. Celasco of their conclusion that Respondent had conducted a full review of Claimants' portfolio and that the accounts "balanced within 8 cents each."

23. After receiving the foregoing response, Mr. Celasco continued to press for a complete analysis and an accounting of his entire portfolio. At that point in time, Respondent, including its employee, Mr. Flasco, told Mr. Celasco that he sent the request to the "Chief Financial Officer for the entire Global Wealth Management business worldwide . . . and personally asked for his assistance in initiating and expediting this reconcilement." Respondent, including its employee, Mr. Flasco, however, never provided Mr. Celasco with the requested reconciliation.

24. Ultimately, after already having lost faith in the representations made to him by Respondent and Mr. Flasco, Mr. Celasco instructed Respondent and Mr. Flasco to liquidate all of his securities to cash until Respondent's review and "reconcilement" of the entire portfolio was complete.

25. Respondent, without Mr. Celasco's knowledge, then removed Mr. Flasco from further management of the assets and investment portfolio and placed Mr. Celasco's them under the custody of the compliance department. It was not until February 2015 that Mr. Celasco learned of this event. *See* attached email dated February 6, 2015, attached hereto as ***Exhibit "O".***

26. At the time of the transfer of Mr. Celasco's investment portfolio to the compliance department, Mr. Celasco was still waiting for the completion of the "reconcilement".

27. Each and every day that Respondent, including its employee, Mr. Flasco, misrepresented the truth regarding Claimants' investment accounts, Respondent, including its employee, Mr. Flasco, violated the fiduciary duties owed to Claimants. As such, the events giving rise to this dispute – all of which constitute a unified offense – continued through 2016. In light of such misconduct, *inter alia*, Respondent's, including its employee, Mr. Flasco's, wrongdoing did not become definite and discoverable any earlier than 2016.

28. When Mr. Celasco finally liquidated his accounts, all that remained was approximately $2,500,000 in equity. That low amount of equity is downright shocking, particularly because Claimants had entrusted well over $15,000,000 to Respondent, including its employee, Mr. Flasco.

***Respondent And Mr. Flasco Were Well Aware Of The Risks Of Investment Advisor Sponsored Wrap Fee Programs And Fee-Based Account Supervision***

29. SEC And State Regulators Have Long Publicly Stated That Wrap Fee Programs Can Create A Significant Conflict Of Interest For An Investment Adviser And May Not Always Be In The Best Interests Of The Client

30. As early as November 2003, FINRA's predecessor, the NASD, reminded members that they must have "reasonable grounds for believing that a fee-based program is appropriate for a particular customer, taking into account the services provided, cost, and customer preferences."

*See* NASD Notice to Members 03-68 (Nov. 2003), attached hereto as ***Exhibit "K".*** The NASD directed members to implement supervisory procedures that require a periodic review of fee-based accounts to determine whether they remain appropriate for their respective customers. Absent unusual circumstances, the NASD stated, these reviews should be conducted annually. The NASD also reminded members of the need to review their sales literature, marketing material, and other correspondence related to fee-based programs to ensure the information is balanced and not misleading, and should include in training materials guidelines regarding the establishment of fee-based accounts.

31. Firms offering fee-based accounts are required by the FINRA rules to develop and implement a supervisory system and written supervisory procedures reasonably designed to monitor their fee-based accounts and the activity in them. *See* FINRA Rules 3110 and 3120. Such supervision is necessary to determine if the fee-based account structure remains appropriate for customers, taking into account the services provided, cost and customer preferences. *Id.*

32. Since 2014, wrap fee programs have been highlighted as an annual exam priority by the U.S. Securities and Exchange Commission's National Exam Program, particularly in the assessment of advisers and whether they are fulfilling fiduciary and contractual obligations to clients and properly managing various aspects such as disclosures, conflicts of interest, best execution, and trading away from the sponsor broker-dealer. *See* Security and Exchange Commission's Office of Compliance Inspections and Examinations ("OCIE") Examination Priorities, 2014, 2015, 2016 and 2017, attached hereto as ***Composite Exhibit "L".***

33. On or around December 7, 2017, the Securities and Exchange Committee issued an Investor Bulletin, wherein it cautioned members and consumers of the dangers and risks of investment advisor sponsored wrap fee programs. The SEC stated that a wrap fee based on the value of

assets in an investment account may be less if there is a lot of trading activity in the account and the wrap fee covers the costs for executing the trades. However, the SEC warned members that if there is little or no trading activity in an advisory account or the trades being made would not otherwise have a transaction fee, a wrap fee arrangement may cost more than separately paying for the services. *See* SEC Investor Bulletin: Investment Adviser Sponsored Wrap Fee Programs (Dec. 7, 2017), attached hereto as ***Exhibit "M".***

34. The above referend articles demonstrate that Merrill Lynch was well aware of their obligations to have reasonable grounds for believing that a fee-based program is appropriate for a particular customers, taking into account the services provided, cost, and customer preference.

## REGULATORY VIOLATIONS

35. FINRA Rule 2010 provides that "[a] member, in the conduct of its business, shall observe high standard of commercial honor and just and equitable principles of trade." It generally is inconsistent with just and equitable principles of trade—and therefore a violation of Rule 2010—to place a customer in an account with a fee structure that reasonably can be expected to result in a greater cost than an alternative account offered by the member that provides the same services and benefits to the customer. *See NASD Notice to Members 03-68 (Nov. 2003).* Before opening a fee-based account for a customer, members must have reasonable grounds to believe that such an account is appropriate for that particular customer. *Id.* In handling Mr. Celasco's accounts, Respondent and its employee, Mr. Flasco, failed to observe a high standard of commercial honor and fair practices. Respondent and its employee, Mr. Flasco, made numerous misrepresentations and omissions in disregard of Claimants' rights, interests and Claimants' investment objectives.

36. FINRA Rule 2111 requires, in part, that a broker-dealer or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [firm] or associated person to ascertain the customer's investment profile." Furthermore, Rule 2111 requires broker-dealers to have reasonable grounds to believe that the form of account is appropriate for that particular client. *Id., See also* Notice to Members 03-68 (November 2003). Respondent and its employee, Mr. Flasco,'s recommendations to place Claimants' accounts in Merrill Lynch's wrap-fee advisory programs was an unsuitable investment strategy. The fee-based wrap-fee advisory accounts were particularly inappropriate for these Claimants' given the low level of trading activity and in light of Claimants' stated investment objectives and risk tolerance. Moreover, Respondent and its employee, Mr. Flasco, failed to maintain and enforce adequate controls relating to the suitability of the wrap-fee advisory programs and accounts placed therein.

37. Additionally, Respondent and its employee, Mr. Flasco, violated FINRA and NASD supervision and compliance rules. Pursuant to FINRA Rule 3110(b)(2), Respondent was required to "establish and maintain a system to supervise the account activities of each registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules." Pursuant to NASD's Notice to Members 03-68, firms must establish systems and procedures to effectively monitor and supervise wrap-fee programs. Respondent did not have proper supervisory and monitoring programs in place to properly supervise and monitor the accounts and their continued enrollment in the fee-based advisory account programs. Even if Respondent did have sufficient monitoring programs in place, Respondent did not effectively

supervise their wrap-fee programs by taking corrective action based on information provided by the monitoring system. As a result, Claimants' accounts remained in the Merrill Lynch wrap-fee programs for years despite the accounts having little or no trading activity and no apparent benefit to Claimants' when compared to the exorbitant fee's being generated by Merrill Lynch and its employee, Mr. Flasco. As such, Respondent and its agents failed to conduct both compliance and supervisory reviews of its registered representative's determination as to the suitability of the Claimants' accounts enrolled in Merrill Lynch's wrap-fee programs. Respondent also failed to monitor advisory accounts for inactivity or "reverse churning" as required under their compliance policies and procedures as well as pursuant to FINRA Rules and SEC Rules to ensure that fee-based advisory or "wrap" accounts that charged an inclusive fee for both advisory services and trading costs remained in the best interest of the Claimants'.

38. FINRA Rule 2122 (former NASD Rule 2430) requires that charges for services "shall be reasonable and not unfairly discriminatory between customers." Even where a fee-based account is determined to be appropriate, members still must comply with their longstanding obligations under FINRA Rule 2122. Charges must be "fair under the relevant circumstances and a member should be prepared to justify that its prices are fair as to each customer and transaction." *See* Notice to Members 03-68. Respondent and its employee, Mr. Flasco, have not, and cannot, justify he high fee's they received for any service performed in each of the Claimants' accounts which were placed in Merrill Lynch's wrap fee accounts. The type and amount of compensation and fees Respondent and its employee, Mr. Flasco, received for the services (or lack thereof) performed in Claimants' wrap-fee accounts was unreasonable and

Respondent and its employee, Mr. Flasco violated FINRA Rule 2122 by charging such for each of the accounts so enrolled.

39. Respondent and its employee, Mr. Flasco, are liable for the misconduct committed by its employees and agents, including but not limited to, Mr. Flasco, under the doctrine of respondeat superior. Respondent and its employee, Mr. Flasco, failed to supervise and monitor Claimants' account, caused Claimants' to suffer substantial damages and continue to suffer substantial damages.

40. Claimants' reserve the right to amend these claims based on new evidence obtained in the course of this arbitration or their ongoing investigation.

## CLAIMS

## COUNT I
## COMMON LAW FIDUCIARY DUTY

41. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 39 above.

42. Respondent and its employee, Mr. Flasco, owed a fiduciary duty to Claimants' based on their relationship with the Claimants' and their control of the Accounts, because of their superior knowledge and because the Claimants' had reposed their trust and confidence in Respondent and its employee, Mr. Flasco.

43. Respondent and its employee, Mr. Flasco, had a fiduciary relationship with Claimants' based on the authority they exercised over Claimants' accounts and assets, their superior knowledge concerning securities and investments, and because Claimants' had reposed their trust and confidence in them.

44. By virtue of their fiduciary relationship, Respondent and its employee, Mr. Flasco, owed, Claimants' a duty of undivided loyalty and utmost good faith and the fundamental obligation to:

a. act in the best interest of the Claimants' and to deal with them honestly and in good faith and with the upmost degree of care;

b. provide investment advice in the Claimants' best interests;

c. maintain Claimants' assets, accounts and investments in a professional and prudent manner;

d. manage Claimants' assets, accounts and investments in a manner that comports with the needs and objectives of the Claimants' and to make only suitable investment recommendations; to keep Claimants' informed as to each transaction completed in their accounts;

e. explain forthrightly to Claimants' the practical implications, impact and potential risks of the transactions and strategy employed for their assets, accounts and investments;

f. not engage in any activity in conflict with the interest of the Claimants', and to take steps reasonably necessary to fulfill their obligations;

g. employ reasonable care to avoid misleading Claimants' and to provide full and fair disclosure of all material facts to them; and

h. eliminate, or at least disclose, all conflicts of interest that might incline them — consciously or unconsciously — to render advice that is not disinterested.

45. Respondent and its employee, Mr. Flasco, breached their duties owed to Claimants' by, among other things:

a. opening dozens of accounts without Claimants' knowledge or authorization; charging exorbitant fees and costs for placing the majority of Mr. Celasco's wealth in unsuitable wrap-fee programs and advisory accounts;

b.  mismanaging in excess of $8,000,000.00 of Claimants' assets; misrepresenting and/or omitting material facts and information regarding the true status of Claimants' accounts and assets solely for their own benefit and not for the benefit of the Claimants';

c.  concealing their improper activity, along with the losses that such activity was producing in the Claimants' accounts, assets and investments;

d.  failing to act with due care when assessing Claimants' risk tolerance, failing to select investments consistent with that risk level and failing to reasonably monitor for risk;

e.  failing to use due diligence to research investments and making selections and recommendations with due care;

f.  failing to monitor Claimants' investments with reasonable frequency for potential changes;

g.  failing to periodically evaluate the quality of the execution being provided to ensure that they are continuing to provide best execution;

h.  failing to recommend only suitable investments to Claimants', based on an appropriate understanding of the Claimants' investment objectives and risk tolerance.

i.  failing to make decisions for Claimants' accounts which were in the Claimants' best interest rather than on the basis of the opportunity to earn greater commission or other fees from the various account arrangements;

j.  failing to provide Claimants' with all data, notices, reports and other information called for in governing documents;

k.  failing to adhere to Claimants' express instructions concerning the MLPA accounts and Mr. Celasco's express desire to not be enrolled in such;

l.  failing to be truthful and accurate in all communications and disclosures;

22

m. failing to be being forthright about issues, mistakes and conflicts of interest;

n. failing to ensure that communications and disclosures were materially complete so as to provide a fair and balanced picture; and

o. failing to avoid representations, communications and disclosures that contained only a partial truth, leaving an exaggerated, unwarranted or other potentially misleading impression.

46. As a result of the foregoing, Respondent and its employee, Mr. Flasco, violated both its common law fiduciary obligations to Claimants' and the FINRA (f/k/a NASD) rules noted above.[3]

## COUNT II
## NEGLIGENCE, GROSS NEGLIGENCE, AND NEGLIGENT SUPERVISION

47. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 45 above.

48. During all relevant time periods, Mr. Flasco was an employee and agent of Respondent and, with Respondent's knowledge, held himself as registered broker acting on their behalf.

49. Merrill Lynch knew, or with the proper supervisory and/or compliance system in place should have known, of the reckless misconduct that was being engaged in by Mr. Flasco, including the mishandling of Claimants' assets and accounts.

50. Merrill Lynch owed Claimants' a duty to reasonably and diligently supervise its agents, including Mr. Flasco, in the management of customer accounts, solicitation of funds for investments and the subsequent purchase of investments.

---

[3] The standards of the profession are set forth in the rules of FINRA (including its Notices to Members) and the SEC, federal, and state statutes including the Securities and Exchange Act, Respondent's own compliance procedures and relevant case law. Even though such industry standards may not be deemed to create private rights of action, they are properly asserted as standards of care against which Respondent's conduct must be measured in determining its liability. *See, e.g., Lange v. Hentz*, 418 F. Supp. 1376, 1383 (N.D. Tex. 1976) (NASD Rules are evidence of the present standard of care which the NASD member should achieve). As detailed herein, Respondent failed to abide by many FINRA rules, including, but not limited to, Conduct Rule 2010 of the FINRA Manual ("High Standards of Commercial Honor/Equitable Principles of Trade").

51. In breach of that duty, Merrill Lynch failed to diligently carry out their supervisory duties and/or maintain and enforce a reasonable and proper system of supervision and internal controls regarding its agents, Mr. Flasco's, improper and fraudulent activities with respect to Claimants' assets and account.

52. As a direct and proximate result of Merrill Lynch's reckless breach of duty, Claimants' have suffered damages.

## COUNT III
## COMMON LAW FRAUD

53. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 51 above.

54. In order to induce Claimants' to entrust its assets to Merrill Lynch, Merrill Lynch and its agent, Mr. Flasco, knowingly and recklessly made numerous material representations and omissions, as described above.

55. Claimants' did not know that the misrepresentations made by Merrill Lynch and its agents were false, nor was it aware that certain facts were intentionally omitted by Merrill Lynch and its agents.

56. The material representations and omissions were made by Merrill Lynch and its agents to be true and Claimants' justifiably relied thereon to their detriment.

57. As a direct and proximate result of these material misrepresentations and omissions, Claimants' have suffered damages.

## COUNT IV
## VIOLATION OF SECTIONS 206(1) AND 206(2) OF THE ADVISERS ACT

58. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 56 above.

59. Merrill Lynch and its employee, Mr. Flasco, are "investment advisers" within the meaning of Section 202(a)(11) of the Investment Advisers Act of 1940 (the "Advisers Act").

60. As set forth above, Merrill Lynch and its employee, Mr. Flasco, opened dozens of accounts without Claimants' knowledge or authorization, charged exorbitant fees and costs for placing the majority of Mr. Celasco's wealth in unsuitable wrap-fee programs and advisory accounts, mismanaged in excess of eight million dollars ($8,000,000.00) of Claimants' assets; misrepresented and/or omitted material facts and information regarding the true nature of Claimants' accounts and assets solely and exclusively for their own benefit and not in the best interests of the Claimants', and concealed their improper activity, along with the losses that such improper and fraudulent activity was producing in the Claimants' accounts, assets and investments.

61. Merrill Lynch, and its employee, Mr. Flasco, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

62. As a result of the conduct described above, Merrill Lynch, including its employee, Mr. Flasco, have willfully violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)]. [4, 5]

## COUNT V
## VIOLATION OF SECTION 206(4) OF THE ADVISERS ACT

63. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 61 above.

---

[4] Scienter is not required to establish a violation of Section 206(2), but rather may rest on a finding of negligence. *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194- 95 (1963)).
[5] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id.* (quoting *Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965)).

64. Section 206(4) of the Advisers Act and Rule 204A-1 thereunder provide that it shall constitute a fraudulent, deceptive or manipulative act, practice or course of business for any registered investment adviser, directly or indirectly, to fail to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules adopted thereunder.

65. During all relevant time periods, including but not limited to from 2009 through 2016, Merrill Lynch did not have such written policies and procedures.

66. As a result, Merrill Lynch willfully violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 204A-1 [17 C.F.R. § 275.204A-1].

67. In addition, Merrill Lynch's employee, Mr. Flasco aided and abetted Merrill Lynch's violation of these provisions.

## COUNT VI
## EQUITABLE ACCOUNTING

68. Claimants' repeat and incorporate by reference the allegations in paragraphs 1 - 66 above.

69. As stated above, Respondent and its employee, Mr. Flasco, owed Claimants' a fiduciary duty.

70. Moreover, the sheer number of accounts opened by Respondent and its employee, Mr. Flasco, without the proper authorization or consent of Mr. Celasco, the millions of dollars mismanaged at the hands of Respondent and its employee, Mr. Celasco, along with the complex nature of the dozens of various brokerage accounts, with different fee structures, and investment strategies at issue makes an action of equitable accounting appropriate here.

## RELIEF SOUGHT

As a result of the conduct and actions described herein, Claimants' have been damaged. Accordingly, Claimants' respectfully request the Panel grant the Claimants' the following relief:

A). disgorgement of Respondent's, including its employee, Mr. Flasco's, ill-gotten gains;

26

B). damages based on fairness and equity;

C). compensatory damages in an amount to be determined at the Final Hearing but currently estimated to be in excess of $8,000,000;

D). all of Claimants' consequential, compensatory and special damages in an amount to be determined at the Final Hearing;

E). punitive damages in an amount determined by the Panel that would impact Merrill Lynch financially so that it would take note that behavior will not be tolerated;

F). prejudgment interest at the statutory rate;

G). equitable accounting; and

H). award such other relief as the Panel deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via email and FINRA DR Portal to: **Jeff Goldman, Esq.,** and **Timothy Burke, Esq.,** Morgan, Lewis & Bockius, LLP, One Federal St., Boston, MA 02110-1726, Jeff.goldman@morganlewis.com, Timothy.burke@morganlewis.com; and **Michele Collins,** Case Administrator, FINRA Dispute Resolution, 300 South Grand Avenue, Suite 1700, Los Angeles, CA 90071, Michele.collins@finra.org, on this 12th day of March, 2018.

**JONES & ADAMS, P.A.**
*Attorneys for Claimants'*
999 Ponce de Leon Boulevard
Suite 925
Coral Gables, FL 33134
Phone: (305) 270-8858
Fax: (305) 270-6778
Email: matthew@jones-adams.com

By:   */s/ Matthew L. Jones   .*
Matthew L. Jones, Esq.
Florida Bar No.: 909335

# Exhibits Omitted

# EXHIBIT D

 CT Corporation

**Service of Process Transmittal**
02/12/2019
CT Log Number 534906476

**TO:**   Michael Bury (BAS & BAIC), AVP Litigation Specialist
Bank of America
South Tower, 225 Liberty St- 2 World Financial Ctr
Mailcode #NY3-002-37-12
New York, NY 10281

**RE:**   **Process Served in Florida**

**FOR:**   Merrill Lynch, Pierce, Fenner & Smith Incorporated   (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Oscar Roberto Celasco, etc., et al., Petitioners vs. Merrill Lynch, pierce, Fenner & Smith Incorporated, Respondent |
| **DOCUMENT(S) SERVED:** | Summons, Motion, Exhibit(s) |
| **COURT/AGENCY:** | Miami-Dade County Circuit Court, FL<br>Case # 19003239CA01 |
| **NATURE OF ACTION:** | Pertaining to Oscar Roberto Celasco |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/12/2019 at 10:54 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Matthew L. Jones<br>JONES & ADAMS. P.A.<br>999 Ponce de Leon Blvd.<br>Suite 925<br>Coral Gables, FL 33134<br>305-270-8858 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/12/2019, Expected Purge Date: 02/17/2019 |
| | Image SOP |
| | Email Notification,  Anitria Walker-Doe  anitria_walker-doe@ml.com |
| | Email Notification,  Mark Borowski  mark.f.borowski@bankofamerica.com |
| | Email Notification,  Michael Bury (BAS & BAIC)  mike.bury@bankofamerica.com |
| | Email Notification,  Jeff Rayball  jeffrey.rayball@bankofamerica.com |
| **SIGNED:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324<br>954-473-5503 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Filing # 84456722 E-Filed 02/05/2019 04:00:00 PM

2/12/19
9:40 a.m.

| ☑ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | | |
|---|---|---|---|
| **DIVISION** ☑ CIVIL ☐ DISTRICTS ☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE** (a) GENERAL FORMS | | **CASE NUMBER** 19-003239 CA 01 |
| **PLAINTIFF(S)** OSCAR ROBERTO CELASCO, individually, and as settlor of GSSC SP; GSSC HOLDINGS LTD.; CENTRICA INVT. CAPITAL, INC.; MESOAMERICA ACRE FARMS, INC.; G.S.S. CAPITAL GROUP LTD.; and WESTWOOD HOLDINGS, INC., | **VS.  DEFENDANT(S)** MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED. | | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on
defendant(s): MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

CT CORPORATION SYSTEM

1200 S. PINE ISLAND ROAD

PLANTATION, FL 33324

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Matthew L. Jones, Esq.

whose address is: JONES & ADAMS, P.A.

999 Ponce de Leon Blvd., Suite 925

Coral Gables, FL 33134

within 20 days * **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to, 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **HARVEY RUVIN** **CLERK of COURTS** | *[signature]* /36565 DEPUTY CLERK | 2/8/2019 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**